993 So.2d 228 (2008)
TRES' CHIC IN A WEEK, L.L.C.
v.
The HOME REALTY STORE, et al.
No. 2007 CA 1373.
Court of Appeal of Louisiana, First Circuit.
July 17, 2008.
*230 Vincent J. Sotile, Jr., Prairievllle, LA, for Plaintiff-Appellant, Tres' Chic in a Week, L.L.C.
Michael P. Bienvenu, Seale, Smith, Zuber, & Barnette, Baton Rouge, LA, for Defendants-Appellees, Jennifer Richardson and C.J. Brown, L.L.C.
Before PARRO, KUHN, and DOWNING, JJ.
PARRO, J.
The buyer of a home appeals from a judgment that granted its real estate agents' motion for summary judgment and dismissed its claims against them. For the following reasons, we affirm.

Factual and Procedural Background
Tres' Chic in a Week, L.L.C. (Tres' Chic) was created by Malea Bourg (Bourg) and Karen Ewing (Ewing) for the purpose of buying, remodeling, and reselling houses in the Baton Rouge area. Real estate agent Jennifer Richardson (Richardson) was employed by C.J. Brown, L.L.C. (Brown) and had been engaged to assist Tres' Chic in purchasing low-priced property in need of renovations. Richardson showed Bourg and Ewing the MLS[1] listing for a home located on Bromley Street in Kenilworth Subdivision in Baton Rouge. The MLS listing indicated that the Bromley Street home had 2,132 square feet of living area. The listing agents for the home were The Home Realty Store and Gordon Pugh, Jr. (Pugh). Considering Bourg and Ewing's estimation of $10,000 for renovation costs, Tres' Chic purchased the home for $148,000 on September 1, 2004. After remodeling, Tres' Chic intended to sell the home for approximately $85 per square foot of living area or $181,220.
After the renovations were completed and while Tres' Chic was showing the home, Ewing and Bourg contacted a realtor friend to verify factors that had a bearing on their asking price. At this time, Ewing learned that Brown's 1999 MLS listing of the home in question indicated that the home had 1,846 square feet of living area. When Bourg and a different realtor friend personally measured the home, they learned that it had substantially less than 2,132 square feet of living area as stated in the 2004 MLS listing. On being contacted by Ewing, Richardson personally measured the home and confirmed Ewing's discovery. Richardson then called Pugh to inquire about his determination of the living area. Although Pugh had measured the home, there was a question as to whether he had measured all four of its sides. The home's actual square footage was 1,861, resulting in a purchase cost to Tres' Chic of $79.52 per square foot of living area.
After actually spending approximately $14,000 on renovations, Tres' Chic sold the home for $155,000. Subsequently, Tres' Chic filed suit against Richardson and Brown,[2] seeking damages for lost profits based on allegations of negligence by Richardson *231 and Brown in representations made regarding the home's square footage of living area. Tres' Chic alleged that Richardson and Brown had knowledge that the actual square footage was 1,861, as opposed to 2,132, based on a prior MSL listing of the home by Brown. Accordingly, it charged that Richardson and Brown were liable for knowingly failing to notify it of the actual square footage of living area, for the misrepresentation, suppression, or omission of the true square footage of living area, and for the negligent misrepresentation of essential facts with the intent to obtain an unjust advantage or to cause damage to Tres' Chic.
Richardson and Brown filed a motion for summary judgment, which was granted by the trial court.[3] Accordingly, they were dismissed from Tres' Chic's suit with prejudice. Tres' Chic appealed, contending that genuine issues of material fact remain as to whether Richardson and Brown were negligent in their representations, whether they had a legal duty to communicate accurate information to potential buyers, whether they breached any such duty, and whether Tres' Chic suffered damages as a result of the breach.

Discussion
Summary judgments are reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Jarrell v. Carter, 632 So.2d 321, 323 (La.App. 1st Cir.1993), writ denied, 94-0700 (La.4/29/94), 637 So.2d 467. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. LSA-C.C.P. art. 966(A)(2); Rambo v. Walker, 96-2538 (La.App. 1st Cir.11/7/97), 704 So.2d 30, 32. The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
The initial burden of proof is on the moving party. However, on issues for which the moving party will not bear the burden of proof at trial, the moving party's burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the nonmoving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial; failure to do so shows that there is no genuine issue of material fact. LSA-C.C.P. art. 966(C)(2); Clark v. Favalora, 98-1802 (La.App. 1st Cir.9/24/99), 745 So.2d 666, 673.
A real estate broker is a professional who holds himself out as trained and experienced to render a specialized service in real estate transactions. The broker stands in a fiduciary relationship to his client and is bound to exercise reasonable care, skill, and diligence in the performance of his duties. Hughes v. Goodreau, 01-2107 (La.App. 1st Cir.12/31/02), 836 So.2d 649, 660, writ denied, 03-0232 (La.4/21/03), 841 So.2d 793. Generally, a broker's duties are limited to those which *232 can be analogically drawn from LSA-R.S. 37:1455 and from the customs and practices of real estate brokers in general. Id. Ultimately, the precise duties of a real estate broker must be determined by an examination of the nature of the task the real estate broker undertakes to perform and by the agreements the broker makes with the involved parties. Id. A duty to refrain from knowingly making any false representations to any party in a real estate transaction is among a broker's duties analogically drawn from LSA-R.S. 37:1455 and from the customs and practices of real estate brokers in general. See Hughes, 836 So.2d at 660; LSA-R.S. 37:1455(A)(15). A real estate broker has a fiduciary duty to his client, and a breach of that duty is actionable under LSA-C.C. art. 2315. If a real estate broker violates LSA-R.S. 37:1455, he breaches his fiduciary duty to his client, and an award of damages under LSA-C.C. art. 2315 would be appropriate. See Hughes, 836 So.2d at 660.
In its petition, Tres' Chic alleged that based on Brown's 1999 MLS listing of the property, Richardson and Brown knew or should have known the actual square footage of living area. In light of such knowledge or presumed knowledge, Tres' Chic contended that they are liable to it for failing to make the true square footage of the living area known to it. Clearly, a broker has a duty to refrain from knowingly making any false representations to any party in a real estate transaction. See LSA-R.S. 37:1455(A)(15). If Richardson and Brown breached this duty, they may be liable to Tres' Chic under LSA-C.C. art. 2315.
Additionally, Tres' Chic asserted a claim for negligent misrepresentation. In order for a plaintiff to recover for negligent misrepresentation, there must be a legal duty on the part of the defendant to supply correct information, a breach of that duty, and damage to the plaintiff caused by the breach. See LSA-C.C. art. 2315; Hughes, 836 So.2d at 663. A real estate broker owes a specific duty to communicate accurate information to the seller and the purchaser and may be held liable for negligent misrepresentation. See Hughes, 836 So.2d at 663. However, to recover, a plaintiff must also show damages as a result of his justifiable reliance on the defendant's misrepresentations. Id. at 663.
Most instances of recovery from a real estate broker in Louisiana for negligent misrepresentation have been in favor of the purchaser. Hughes, 836 So.2d at 663. Louisiana's jurisprudential development of the tort of negligent misrepresentation has not been restricted to a set theory. Id. It has been broadly used to encompass situations of non-disclosure in fiduciary relationships to situations of direct disclosure to non-clients. Id. The case-by-case application of the duty/risk analysis, presently employed by our courts, adequately protects the misinformer and the misinformed because the initial inquiry is whether, as a matter of law, a duty is owed to this particular plaintiff to protect him from this particular harm. Id.
In support of their motion for summary judgment, Richardson and Brown offered testimonial excerpts from the depositions of Ewing, Bourg, Pugh, and Richardson. In opposing the motion for summary judgment, Tres' Chic offered the MLS listings from 1999 and 2004, the affidavits of Peter Panepinto (Panepinto) and Erin Adams Aguillard (Aguillard), and excerpts from the depositions of Richardson, Ewing, and Pugh.
Richardson testified that she had been employed by Brown for 14 or 15 years and had been involved in thousands of real estate transactions. Richardson had also *233 personally purchased investment properties about 20 to 25 times to renovate and resell. In her own personal dealings, Richardson generally did not order an appraisal until renovations were complete and the property was ready to be marketed. In her experience, Richardson had never had a significant problem with measurement before. According to Richardson, she accepts whatever is in the MLS listing, because the MLS listing is generally "gospel," in that she believes that the realtor advertisement should be correct.
Based on Richardson's experience in purchasing investment property in need of remodeling, Bourg felt that Richardson would be able to give her and Ewing advice on keeping their costs down. According to Ewing, when they met with Richardson for the first time, they discussed whether the home would be worth purchasing in terms of price per square foot of living area. Ewing and Bourg decided to use a realtor to avoid making a mistake. Ewing testified that they relied on Richardson's advice. Richardson explained that she provided Ewing and Bourg with a property condition disclosure, other disclosure documents, and the 2004 MLS listing printout. Ewing explained that Richardson helped them to determine square footage, pricing, comparables, and selling price per square foot once renovations were made.
Ewing identified the 2004 MLS listing that had first been shown to her by Richardson. Ewing testified that Richardson explained that following the signing of a purchase agreement, they would have 10 days to have an inspection performed and to complete the legal paperwork for the business. Richardson provided them with a list of things to do and of people and businesses, including home inspectors, to contact.
A purchase agreement was executed by Tres' Chic on August 20, 2004. Because Ewing and Bourg noticed that the left side of the house leaned, Tres' Chic hired someone to perform a general home inspection and foundation inspection. Since Tres' Chic planned to remodel the house, Richardson recommended that they not incur the costs of having an appraisal performed at that time. However, Bourg testified Richardson had never advised them against verifying the square footage. Bourg admitted that an appraisal was only one way of verifying the square footage. Bourg stated that she could have measured the home, or they could have hired someone else or asked Richardson to measure the home. Ewing testified that it never occurred to her that the square footage disclosed in the 2004 MLS listing could be "flagrantly" incorrect. Although it was clearly afforded the opportunity to verify the square footage, Tres' Chic elected not to do so. According to Ewing, they first learned on November 30 from Aguillard, a realtor friend, of the discrepancy in the measurement. Aguillard's discovery was made when she located two prior listings of the home.
Pugh testified that he was responsible for putting the measurements in the 2004 MLS listing. According to Pugh, the square footage measurement is usually taken from an appraisal, but none was available. By plugging in the address of the property, Pugh generally researches a MLS history to see if a property has been previously listed. In this case, when he performed the MLS search in 2004, Pugh discovered that it had been listed before as having 1,846 square feet of living area. Pugh explained that in his practice, he performs independent measurements rather than rely on measurements in prior listings. As a buyer's agent who discovers a discrepancy in the square footage after researching the listing history, Pugh indicated *234 that he would inform the buyer about the discrepancy.
Pugh explained that approximate measurements are used because measurements may vary depending on what is used in performing the measurements. Pugh testified that he used a tape measure to determine the square footage of the home in question. He was accompanied by Panepinto. Pugh reported that he measured the outside of the home while Panepinto measured the rooms inside of the home. Although Pugh could not remember measuring this particular home, he explained that he generally measures from one corner to the next corner in a box and then deducts for recessed areas. In his affidavit, Panepinto confirmed that he was with Pugh when the measurements were performed on the home. Panepinto averred that he assisted Pugh by writing down measurement numbers that were given to him by Pugh. According to Panepinto, Pugh did not measure all four sides of the home.[4]
According to Richardson, the job of measuring the home is for the listing agent; the buyer's agent generally does not measure a home for the buyer. Richardson testified that the industry relies on the numbers that appears on a MLS report, Richardson trusted that Pugh, a broker and real estate agent with a law degree and membership in the MLS, had measured the property.
If a client wants to verify anything while the sale is pending, Richardson stated that she is happy to assist them. Richardson testified that initially, measurements were not an issue in this sale. No one had any reason to question what was stated on the MLS listing. The square footage of living area was stated in the MLS listing. Bourg and Ewing were free to verify it. Ewing admitted that Richardson, like them, relied on the measurement provided in the MLS listing and never personally measured the home.
Aguillard, whose affidavit was offered by Tres' Chic in opposing the motion for summary judgment, had been employed as a real estate agent since January 2004. Aguillard averred that during that time, she had acted as a buyer's agent in over 40 transactions. Aguillard declared that as a buyer's agent, she always reviewed the property's MLS listing history to verify the accuracy of the numbers on the current listing. According to Aguillard, it is the duty of the buyer's agent to communicate discrepancies of the information on the current MLS listing and previous listings on the same property found through a search of the MLS history on that property.
After reviewing the record, we find no evidence that Richardson knew that the home only had 1,861 square feet of living area as opposed to 2,132. Richardson, Ewing, and Bourg were all under the mistaken belief that Pugh had accurately disclosed the square footage of the home in the 2004 MLS listing, Therefore, we conclude that Richardson and Brown have shown that Tres' Chic is unable to establish a prima facie case that Richardson knowingly made any false representations concerning the square footage of living area of this home as contemplated by LSA-R.S. 37:1455(A)(15). However, based on the documentation offered by Tres' Chic in opposition to the motion for summary judgment, we find that the record does not establish whether the customs and practices of real estate brokers in general required that Richardson, as the buyer's agent, research the MLS history for the property in question. If the customs *235 and practices of real estate brokers in general impose such a duty, it was clearly breached by Richardson in this case, and Richardson and Brown might be liable to Tres' Chic under LSA-C.C. art. 2315 for negligent misrepresentation.
Nonetheless, we must determine if Tres' Chic has shown that a genuine issue of material fact exists as to the issue of justifiable reliance. Relying on Richardson's testimony concerning the reliance that she and the industry place on information contained in a MLS listing, Tres' Chic urged that it was justified in relying on the square footage information provided by Richardson and the MLS listing. Richardson and Brown argue that pursuant to the purchase agreement, Tres' Chic was responsible for verifying the square footage of the home.
Initially, we note that the MLS listing that was provided to Ewing and Bourg indicated that the information was deemed reliable but was not guaranteed. Furthermore, the purchase agreement that was executed by Tres' Chic on August 20, 2004, stated that the indicated property measurements, square footage, and room dimensions made by the real estate brokers involved in the subject transactions were not warranted or assured to be accurate. In the agreement, Tres' Chic acknowledged that the property was being purchased as seen, waiving any and all inconsistencies or omissions in such measurements, determinations, or square footage by brokers. In turn, Tres' Chic was granted the right to perform an inspection for "verification of square footage" within the 10-day period after the execution of the purchase agreement.
Richardson testified that she went through and explained provisions of the purchase agreement with Ewing or Bourg. According to Ewing, she was only asked to sign the document. Ewing denied that Richardson asked her to read the purchase agreement, and she did not recall seeing or reading the provision that indicated that the information was deemed reliable but was not guaranteed. Ewing admitted that she should have read that provision in the purchase agreement. She is correct, in that when a party having the capacity to read an instrument signs it without reading it, he is bound by it. See Georgia-Pacific Corp. v. Haynes, 432 So.2d 899, 901 (La.App. 1st Cir.1983). Bourg explained that had she read the language concerning the realtors not warranting the square footage measurement and advising them, as buyers, to independently investigate the things that were important to them, she would have been alerted to the need to investigate and would have had the property measured or appraised. Furthermore, Richardson testified that she warned them that the sale was "as is," so they needed to satisfy themselves prior to signing the act of sale.
Based on the disclaimer language in the purchase agreement,[5] we find that Tres' Chic has failed to show that it was justified in relying on the measurements stated in the 2004 MLS listing. In light of Tres' Chic's inability to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof as to this essential element of its claim for negligent misrepresentation, we conclude that the trial court properly granted Richardson and Brown's motion for summary judgment.

Decree
For the foregoing reasons, the judgment of the trial court is affirmed. The cost of *236 this appeal is assessed to Tres' Chic in a Week, L.L.C.
AFFIRMED.
NOTES
[1] The acronym "MLS" stands for Multiple Listing Service.
[2] Tres' Chic also named the listing agents, The Home Realty Store and Pugh, as defendants, as well as the sellers, Francis Sprague Pugh and Mary Elizabeth McCurdy Pugh.
[3] The sellers and the listing agents also filed motions for summary judgment. The sellers' motion was granted, and all claims against them were dismissed. The motion by Pugh and The Home Realty Store was denied.
[4] Pugh denied measuring only three sides of the home.
[5] See Strange v. Kennard, 99-0406 (La.App. 1st Cir.3/31/00), 763 So.2d 710, 712.