STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 CA 0277

DESSIE FALCON BELLA

VERSUS

MARY KNIEPER AND HENRY KNIEPER

Judgment Rendered: **NOV 2 0 2024**

\* \* \* \* \*

On Appeal from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 714077

Honorable Donald R. Johnson, Judge Presiding

\* \* \* \* \*

Charles A. Schutte, Jr.
Baton Rouge, LA

Attorney for Plaintiff/Defendant
in Reconvention-Appellant,
Dessie Falcon Bella

J. Mark Robinson
Baton Rouge, LA

Attorney for Defendants/Plaintiffs
in Reconvention-Appellees,
Mary and Henry Knieper

\* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

Theriot, J concurs
Chutz, J. concurs by CHH

**HESTER, J.**

Plaintiff/Defendant in reconvention, Dessie Falcon Bella, appeals the trial court's judgment, dismissing her petition against defendants/plaintiffs in reconvention, Mary and Henry Knieper, with prejudice, and rendering judgment in favor of the Kniepers on the reconventional demand. For the reasons that follow, we reverse, render, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Dessie Falcon Bella ("Bella") placed her home located at 17703 Shady Creek Avenue, Baton Rouge, Louisiana 70816 (the "Property") for sale in August of 2021 after moving into a new home in November of 2019.[1] The Property generated multiple offers, and Bella accepted an offer from Yolanda Hill ("Hill").[2] Around the same time, Mary ("Mary") and Henry ("Henry") Knieper (sometimes collectively referred to as the "Kniepers") made an offer on the Property, which was rejected.

After the sale to Hill fell through, Mary submitted a Louisiana Residential Agreement to Buy or Sell ("Purchase Agreement") on October 9, 2021, providing for the purchase of the Property.[3] Bella responded with a counteroffer, which was accepted on October 11, 2021.[4] According to the Purchase Agreement, Mary agreed to purchase the Property for $475,000.00, allotted "0" calendar days for an inspection and due diligence period, and agreed to purchase the Property without

---

[1] Other than a three-month period around March of 2020 when her son stayed there, the Property was unoccupied after Bella moved out in November of 2019.

[2] We note that while Hill is identified as "Mary Hill" in Kniepers' reconventional demand and as "Lisa Hill" and "Yolanda Hill" throughout the record, the Inspection and Due Diligence Response and Contingency Removal identifies Hill as "Yolanda Hill" and "Yolanda R. Hill."

[3] Mary is the signatory to the Purchase Agreement. Henry was fishing on the day Mary signed the Purchase Agreement and could not be reached. She informed him later that she signed the document; however, her testimony affirmed that she never indicated that she did not have permission to enter into the contract as a couple.

[4] Hereinafter, the use of the term "Purchase Agreement" includes the October 9, 2021 Purchase Agreement and subsequently incorporated written agreements, which include the counteroffer and the written, signed, and mutually agreed-upon addendums.

2

warranties, including the warranty of fitness for ordinary or particular use pursuant to La. Civ. Code art. 2524, and waived, relieved, and released Bella from any claims or causes of action for redhibition or reduction in sales price. As required by law, Bella furnished a Property Disclosure Document (the "Disclosure"), which was executed on August 13, 2021. With the exception of the disclosure of the Property flooding in 2016, Bella indicated that she was not aware of any other issues affecting the land, structures, or systems.

The original closing date of October 22, 2021, was extended to November 29, 2021 by mutual agreement of Bella and Mary.[5] Prior to the closing date, Mary submitted a Cancellation of Purchase Agreement dated November 4, 2021, seeking to declare the Purchase Agreement null and void due to the inability to obtain financing.[6] However, the Purchase Agreement provided for a cash sale and was not conditioned on the Mary's ability to obtain financing as specified in the Purchase Agreement.[7] Bella's realtor Tiffany McBride ("McBride") responded to the November 4, 2021 cancellation by e-mail to the Kniepers' realtor Cathy Derbonne ("Derbonne") on November 7, 2021, indicating that Bella elected not to sign the cancellation and that the Kniepers were in default and were expected to fulfill the terms of the Purchase Agreement.[8]

---

[5] The Purchase Agreement provided that "[a]ny change of the date for execution of the Act of Sale must be mutually agreed upon in writing and signed by the SELLER and the BUYER," which requirements were met through the extension.

[6] The letters in evidence denying Mary's financing were dated October 18 and 19, 2021, which was before the parties signed the document extending the closing date from October 22, 2011 to November 29, 2021; however, the inability to obtain financing was not mentioned until the cancellation notice on November 4, 2021.

[7] Specifically, the Purchase Agreement provided "Buyer to pay $300,000.00 in cash and remaining $175,000.00 to be paid for in cash through personal loan. Should buyer not be able to obtain personal loan, buyer agrees to pay contract price of $475,000.00 in cash."

[8] McBride's correspondence further indicated that should the Kniepers wish to obtain a cancellation, Bella would agree to a settlement and hold harmless for the amount of $12,000.00, to include the escrow deposit.

On November 15, 2021, Mary submitted a second Cancellation of Purchase Agreement ("Second Cancellation") again seeking to declare the Purchase Agreement null and void. The Second Cancellation stated as follows:

> Seller withheld material information from the property disclosure document and failed to update the buyers [with] this information as it came available, these items listed below should have been disclosed at the inception of the executed contract including but not limited to 1)roof damage, 2)exterior door damage, 3)garage door and frame damage, 4)broken stucco, and other post-Hurricane Ida damages.

> Seller's [sic] failed to follow line items 164, 165, 166, of the [Purchase Agreement], the seller is responsible for maintaining the property in substantially the same or better condition as it was when the agreement was fully executed. The failure to disclose the above items and update the MLS and the buyer and buyer's agent with these items, creates multiple redhibitory defects that gives the buyer cause to terminate the contract.

The Second Cancellation included attached pictures of some of the referenced items. Bella, through her attorney, responded in writing on November 22, 2021, noting that both cancellations were rejected because neither stated a valid reason for cancellation under the Purchase Agreement and demanding that the sale close on or before November 29, 2021, in accordance with the Purchase Agreement. Ultimately, the Kniepers failed to appear at the closing, and the sale did not close on November 29, 2021.

On December 14, 2021, Bella filed suit against the Kniepers, seeking a declaration that the Kniepers defaulted under the Purchase Agreement by failing to timely close on the sale of the Property and that Bella had the right to terminate the Purchase Agreement as a result of the default. Bella further sought the award of stipulated damages in the amount of $47,500.00 (ten percent of the sale price), the retention of the $2,000.00 escrow deposit, and the award of attorney's fees and costs pursuant to the terms of the Purchase Agreement.

The Kniepers answered, admitting that they did not attend the closing on November 29, 2021. However, the Kniepers denied as written the allegation that "[t]here were no contingencies in the Purchase Agreement permitting Knieper to

terminate the Purchase Agreement." Further answering, the Kniepers stated that on or about November 16, 2021, they observed what appeared to be damage to the garage door and stucco trim above the garage door, which was not disclosed in the Disclosure and which damage appeared to have occurred after the execution of the Purchase Agreement.[9] The Kniepers also indicated that on or about October 11-12, 2021, they discovered "what appeared to be damage to the millwork in the kitchen ... which damage had likewise not been disclosed" to the Kniepers in the Disclosure.

On October 3, 2022, the Kniepers filed a first supplemental answer and reconventional demand. The Kniepers set forth affirmative defenses, maintaining, in part, that Bella's claims are barred for failure to mitigate any alleged damages, that Bella is estopped from the amounts claimed in the petition as such amounts are offset by damages resulting from Bella's own negligence, breach of fiduciary duty, self-dealing, fraud, conversion, and/or breach of contract, and that Bella's claims are barred by error, mistake, duress, extinguishment of the obligation, and lack of consideration.

In the reconventional demand, the Kniepers alleged that Bella entered into a prior purchase agreement with Hill, who caused an inspection to be performed on the Property on or about September 8, 2021. The Kniepers alleged that Hill furnished a copy of the inspection report (the "Hill Inspection Report") to Bella. The Hill Inspection Report allegedly found a number of defects in the Property, some of which involved roof areas, exterior doors and windows, front sidewalk area, fascia around a dormer window, garage door, roof structure in attic, interior windows, cooling system, stove, whirlpool bathtub, electrical panel, and other areas of the Property. The Kniepers alleged that Bella received the Hill Inspection Report and had knowledge of all of its contents but failed to "disclose the existence of the [Hill

---

[9] This November 16, 2021 discovery was after Mary sent the Second Cancellation on November 15, 2021.

Inspection Report] to [the Kniepers], did not disclose any of the defects in the Property contained in the … inspection, but instead delivered to [the Kniepers] a Property Disclosure Document dated August 13, 2021," which predated the inspection. Accordingly, the Kniepers allege that Bella knowingly provided an inaccurate Disclosure that contained false information. "[A]s a result of [Bella's] breach, misrepresentations and upon information and belief, [Bella's] fraud," the Kniepers sought stipulated damages in the amount of $47,500.00, plus attorney's fees and costs.

A bench trial was conducted on October 17, 2023. Bella, McBride, Mary, and Derbonne testified at the trial. Bella introduced evidence at trial, including the Purchase Agreement, which included, in part, the Counteroffer Addendum, Deposit Addendum, the Disclosure, Waiver of Warranty and Redhibition Rights Addendum, an Addendum dated 10/09/2021,[10] Buyer's Inspection Waiver, and Extension of Agreement to Purchase and Sell; e-mail correspondence between realtors relative to the cancellations; and e-mail correspondence regarding the closing with the title company. The Kniepers also introduced evidence at trial, including in part the Inspection and Due Diligence Response and Contingency Removal from Hill to Bella in September 2021 (excluding referenced attachments); Deposit Addendum; e-mail correspondence between the title company, the parties, and the realtors; the Disclosure; Counteroffer Addendum; Cancellation of Purchase Agreement dated November 4, 2021; and Second Cancellation dated November 15, 2021 (with attached photographs). Notably, the Hill Inspection Report was not introduced at trial.

At the conclusion of trial, the court instructed counsel to draft their own "proposed remedy based upon [their] perception of what the facts really are." The

_____

[10] The 10/09/2021 Addendum provided that Bella agreed to purchase a home service/warranty plan at closing.

trial court further instructed, "Based upon your summations in your argument, give me a judgment that reasonably articulates your recommended decision for the court." Adopting the Kniepers' post-trial memorandum as written reasons,[11] the trial court issued judgment on October 27, 2023, in favor of the Kniepers as plaintiffs in reconvention and against Bella as defendant in reconvention. The Kniepers were awarded damages in the amount $47,500.00, in addition to the $2,000.00 deposit, plus legal interest and court costs. The judgment also provided that an award of attorney's fees would be made at a later date and dismissed the petition of Bella with prejudice and at her cost.

Bella suspensively appealed and further sought a stay of the execution of the judgment, which was granted. On appeal, Bella assigns the following errors: (1) the trial court erred in finding Bella violated the provisions of the Residential Property Disclosure Act; (2) the trial court erred in finding Bella made intentional misrepresentations; (3) the trial court erred in awarding liquidated damages to the Kniepers under the Purchase Agreement; (4) the trial court erred in awarding attorney's fees to the Kniepers under the Purchase Agreement; (5) the trial court erred in denying Bella's claim that the Kniepers defaulted under the Purchase Agreement; and (6) the trial court erred in denying Bella remedies under the Purchase Agreement.

---

[11] Regarding a trial court's adoption of a party's memorandum as its reasons for judgment, this court has stated that the better course by far is for a trial judge to author any reasons for judgment himself, thereby giving this court the benefits of his thoughts and his insights into the litigation under consideration. It is one thing for victorious counsel to prepare a judgment comprised of the stark, final determinations of a case. It is quite another for a counsel to present as the inner thoughts of a judge what amounts to a well-written brief. **King v. Allen Court Apartments II**, 2015-0858 (La. App. 1st Cir. 12/23/15), 185 So.3d 835, 839, writ denied, 2016-0148 (La. 3/14/16), 189 So.3d 1069 (quoting **Bell v. Ayio**, 97-0534 (La. App. 1st Cir. 11/13/98), 731 So.2d 893, 896, writ denied, 98-3115 (La. 2/5/99), 738 So.2d 7). This court further acknowledged that "this court cannot place any real value on the written reasons drafted entirely by counsel for one of the parties." **King**, 185 So.3d at 839 (citing **Bell**, 731 So.2d at 896).

## STANDARD OF REVIEW

In reviewing a trial court's findings of fact, an appellate court may not set aside those findings absent manifest error or unless the findings are clearly wrong. **Stobart v. State through Dep't of Transp. & Dev.**, 617 So. 2d 880, 882 (La. 1993). In order to reverse a trial court's findings, an appellate court must determine that there exists no reasonable basis for the trial court's factual finding and the record shows the finding is clearly wrong or manifestly erroneous after a review the record in its entirety. **Id**. "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review *where conflict exists in the testimony*." **Id**. (Emphasis added.)

While it is not accurate to state that a trial court's factual findings can never or hardly ever be erroneous, deference should be given to the fact finder. **Bonin v. Ferrellgas, Inc.**, 2003-3024 (La. 7/2/04), 877 So.2d 89, 95. Accordingly, when the evidence supports two permissible views, a fact finder's choice of one of the views cannot be said to be clearly wrong or manifestly erroneous. **Id**. However, in evaluating and weighing the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness, even when the witness is a party, absent a sound reason for its rejection or circumstances in the record casting suspicion on the reliability of the testimony. **Holiday v. Borden Chem.**, 508 So.2d 1381, 1383 (La. 1987); **Johnson v. Ins. Co. of N. Am.**, 454 So.2d 1113, 1117 (La. 1984). **Mergen v. Piper Aircraft Corp.**, 524 So.2d 1348, 1352 (La. App. 1st Cir. 1988), writs denied, 532 So.2d 154, 155, 156 (La. 1988) ("The evidence of witnesses which stands uncontradicted must be accepted as true.")

An appellate court applies a *de novo* standard of review to statutory and contract interpretation. **Lonesome Dev., LLC v. Town of Abita Springs**, 2021-1463 (La. App. 1st Cir. 6/29/22), 343 So.3d 831, 839, writ denied, 2022-01158 (La.

11/1/22), 349 So.3d 3. When a trial court commits an error of law, the reviewing court is not subject to the manifest error standard and can make an independent determination of the facts from the record on appeal. **In re E.W.**, 2009-1589 (La. App. 1st Cir. 5/7/10), 38 So.3d 1033, 1038 (citing **Arabie Bros. Trucking Co. v. Gautreaux**, 2003–0120 (La. App. 1st Cir. 8/4/04), 880 So.2d 932, 938, <u>writ denied</u>, 2004–2481 (La. 12/10/04), 888 So.2d 846.)

## LEGAL PRECEPTS

The Residential Property Disclosure Act, La. R.S. 9:3195, *et seq.* (the "Act"), is central to the issues presented in this appeal. The Act requires that the "seller of residential real property shall complete a property disclosure document in a form prescribed by the Louisiana Real Estate Commission or a form that contains at least the minimum language prescribed by the commission." La. R.S. 9:3198(A)(1).

"Property disclosure document" is a defined term under the Act and "means a document in a form prescribed by the Louisiana Real Estate Commission, or a form that contains at least the minimum language prescribed by the commission, which is presented by the seller to the purchaser in the manner set forth in R.S. 9:3198(B) and which discloses, at a minimum, known defects in the residential real property." La. R.S. 9:3196(2). Louisiana Revised Statutes 9:3198(B)(1) provides as follows:

> *The seller shall complete the property disclosure document in good faith to the best of the seller's belief and knowledge as of the date the disclosure is completed and signed by the seller.* If the seller has no knowledge or information required by the disclosure document, the seller shall so indicate on the disclosure statement and shall be in compliance with this Chapter.

(Emphasis added.)

"Known defect" is also a defined term in the Act. Louisiana Revised Statutes 9:3196(1) provides as follows:

> "Known defect" means a condition found within the property that was actually known by the seller and that results in any of the following:
>
> (a) Has a substantial adverse effect on the value of the property.

9

(b) Significantly impairs the health or safety of future occupants of the property.

(c) If not repaired, removed, or replaced, significantly shortens the expected normal life of the property.

The Act sets forth that the property disclosure document does not serve as a warranty by the seller and cannot be used by the purchaser as a substitution for inspection or warranties. La. R.S. 9:3198(D); see also **Williams v. Nelson**, 2018-207 (La. App. 5th Cir. 12/19/18) 263 So.3d 466, 474, writ denied, 2019-0092 (La. 3/18/19), 267 So.3d 92. Specifically, La. R.S. 9:3198(D) provides as follows:

(1) A property disclosure document shall not be considered as a warranty by the seller. The information contained within the property disclosure document is for disclosure purposes only and is not intended to be a part of any contract between the purchaser and seller.

(2) The property disclosure document may not be used as a substitute for any inspections or warranties that the purchaser or seller may obtain. Nothing in this Chapter precludes the rights or duties of a purchaser to inspect the physical condition of the property.

Importantly, the Act specifically exempts from liability a seller who makes an error or omission that is not a willful misrepresentation, providing in La. R.S. 9:3198(E) as follows:

A seller shall not be liable for any error, inaccuracy, or omission of any information required to be delivered to the purchaser in a property disclosure document if either of the following conditions exists:

(1) The error, inaccuracy, or omission was not a willful misrepresentation according to the best of the seller's information, knowledge, and belief.

(2) The error, inaccuracy, or omission was based on information provided by a public body or by another person with a professional license or special knowledge who provided a written or oral report or opinion that the seller reasonably believed to be correct and which was transmitted by the seller to the purchaser.

A seller who makes a willful misrepresentation can be found liable under the fraud articles in the Louisiana Civil Code. See **Stutts v. Melton**, 2013-0557 (La. 10/15/13), 130 So.3d 808, 813. Stated another way, "[a] claim that the seller violated the provisions of the [Act] … is a fraud claim." **Id**. at 815-16. See also La. R.S.

9:3200 ("This Chapter shall not limit or modify any obligation between buyers and sellers created by any other statute or that may exist in law.")

## LAW AND ANALYSIS

In her first and second assignments of error, Bella maintains that the trial court erred in finding she violated La. R.S. 9:3198 and that the trial court erred in finding that she made intentional misrepresentations in the Disclosure.[12]

Bella completed the Disclosure in accordance with La. R.S. 9:3198(A)(1) on August 13, 2021, *prior* to the earliest known existence of the Hill Inspection Report in September of 2021. Louisiana Revised Statutes 9:3198(B) required Bella to complete the Disclosure in good faith to the best of her belief and knowledge *as of the date the property disclosure document is **completed** and signed by the seller*.[13] However, La. R.S. 9:3198(C) states that "[i]f information disclosed in accordance with [the Act] becomes inaccurate as a result of any action, occurrence, or agreement after ***delivery*** of the property disclosure document, the resulting inaccuracy does not constitute a violation of [the Act]." (Emphasis added.)

Here, the Purchase Agreement indicated that the sale was "AS IS" and without warranties. Additionally, the Disclosure could not be considered a warranty by Bella. See La. R.S. 9:3198(D)(1). According to La. R.S. 3198(D)(1), the Disclosure was for disclosure purposes only and was not part of the Purchase Agreement, *i.e.*, the Disclosure itself did not alter any rights and obligations between Bella and the

---

[12] It is noted that the intentional misrepresentation alleged by the Kniepers in the reconventional demand is the failure to disclose defects in the Property in the Disclosure. No other intentional misrepresentation or fraudulent act is alleged in the pleadings.

[13] Louisiana Revised Statutes 9:3198(B)(2) requires that the seller deliver the property disclosure document no later than the time the purchaser makes an offer to purchase. If the property disclosure document is delivered after the purchaser makes an offer to purchase, then the purchaser may terminate the resulting real estate contract or withdraw the offer no later than 72 hours, excluding federal and state holidays and weekends, after the receipt of the property disclosure document. La. R.S. 9:3198(B)(3)(a). However, the Kniepers do not allege any claims related to La. R.S. 9:3198(B)(2) and (3).

Kniepers in the Purchase Agreement.[14] However, a claim that Bella violated the Act is considered a fraud claim. See **Stutts**, 130 So.3d at 815-16.

Louisiana Revised Statutes 9:3198(D)(2) provides that a property disclosure document cannot be used as a substitute for any inspections or warranties that the purchaser or seller may obtain and provides that nothing in the Act precludes the rights or duties of a purchaser to inspect the physical condition of the property. Notwithstanding, the Kniepers elected to forgo the inspection and due diligence period in the Purchase Agreement and waived all warranties.[15]

The Kniepers argue that once Bella received the Hill Inspection Report, "she could no longer use the property disclosure document as a substitute for the inspection she clearly obtained," citing to La. R.S. 9:3198(D)(2). However, the plain language of La. R.S. 9:3198(D)(2) does not support the Kniepers' interpretation. While the Act does not define the term "obtain" or provide guidance concerning the meaning of "obtain" as used in La. R.S. 9:3198(D)(2), the words of a law must be given their generally prevailing meaning. La. Civ. Code art. 11. According to Black's Law Dictionary, "obtain" means,

> 1. To bring into one's own possession; to procure, esp. through effort <to obtain wealth>. 2. To succeed either in accomplishing (something) or in having it be accomplished; to attain by effort <to obtain a loan>. 3. To be established by law or custom; to be prevalent or general <the same rule obtains in Arkansas>.

Black's Law Dictionary (12th ed. 2024). Bella did not procure an inspection through any effort of her own. She *received* an inspection report obtained by Hill.[16] Thus,

_____

[14] See also La. Civ. Code art. 1848; **Martin Expl. Co. v. Amoco Prod. Co.**, 93-0349 (La. App. 1st Cir. 5/20/94) 637 So.2d 1202, 1205, writ denied, 94-2003 (La. 11/4/94), 644 So.2d 1048 ("The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence.")

[15] We note that the Kniepers' realtor testified that she was aware an inspection was done because it was noted in the "MLS" and knew she could contact the previous prospective buyer. "MLS" is an acronym for Multiple Listing Service. **Tres' Chic in a Week, L.L.C. v. Home Realty Store**, 2007-1373 (La. App. 1st Cir. 7/17/08), 993 So.2d 228, 230, n.1.

[16] Notably, Black's Law Dictionary defines "receive," in relevant part, as "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source."

12

Bella did not *obtain* an inspection as that term is used in La. R.S. 9:3198(D)(2). Accordingly, La. R.S. 9:3198(D)(2) does not apply to Bella's use of the Disclosure in this case. The trial court erred to the extent the it interpreted and applied La. R.S. 9:3198(D)(2) otherwise.

The Kniepers further argued that because the Hill Inspection Report existed and was transmitted to Bella, she was aware of all items noted in the Hill Inspection Report; therefore, the Disclosure contained false statements and which constituted willful misrepresentations by Bella. Essentially, the Kniepers argued that constructive knowledge of the Hill Inspection Report and the alleged defects contained therein triggered Bella's obligation to make disclosures under the Act.

According to La. R.S. 9:3198(E)(1), a seller is not liable for any error, inaccuracy, or omission of any information required to be delivered to the purchaser in a property disclosure document; however, the error, inaccuracy, or omission cannot be a willful misrepresentation according to the best of the seller's information, knowledge, and belief. Importantly, the "information required to be delivered to the purchaser in a property disclosure document" is "known defects in the residential real property." La. R.S. 9:3198(E) and 3196(2).

A "known defect" is a condition found within the property that was *actually known* by the seller and (1) results in a substantial adverse effect on the value of the property, (2) a significant impairment to the health or safety of future occupants of the property, or (3) if not repaired, removed, or replaced, significantly shortens the expected normal life of the property. La. R.S. 9:3196(1). By the precise language of the statute, constructive knowledge is not sufficient. **Id**. Accordingly, the Kniepers, as plaintiffs in reconvention, bore the burden of proving that (1) Bella *actually knew* of the contents of the Hill Inspection Report **and** (2) that the contents of the Hill Inspection Report, in fact, contained known defects as that term is defined in La. R. S. 9:3196(1). See **Lasha v. Olin Corp.**, 625 So.2d 1002, 1005 (La. 1993)

13

("In Louisiana tort cases and other ordinary civil actions, the plaintiff, in general, has the burden of proving every essential element of his case, including the cause-in-fact of damage, by a preponderance of the evidence... .").

The Hill Inspection Report was never introduced into evidence at the trial. At trial, Mary was asked what items were supposedly listed on the Hill Inspection Report, to which she responded:

> So electrical problems, no ground on the house; plumbing problems, no drain for the hot water heater under the sink; possible mold problems because the cabinets weren't removed. I was told ... the holes at the bottom of the cabinets were for electrical equipment and I don't see how that could be. But anyway, ... the roof damage; the electrical damage, there is a toggle switch on the spa that they deemed was - - that could be dangerous. The gas lines in the attic are flexible and exposed and the carbon dioxide monitors were constantly beeping. So, those are just a few things that were major.

However, we do not need to determine whether Mary's testimony alone was sufficient proof of whether any of these items purportedly contained in the Hill Inspection Report constitute a "known defect" in light of our determination that the record fails to support a finding that Bella had actual knowledge of any defects.

The only evidence related to Bella's actual knowledge of the alleged defects contained within the Hill Inspection Report was Bella's own testimony and that of her realtor, McBride. Bella testified that that she knew of the existence of the Hill Inspection Report and that her realtor emailed a copy of the Hill Inspection Report to her. Bella was also questioned about the Inspection and Due Diligence Response and Contingency Removal from Hill to Bella in September 2021 ("Hill Requests"). According to the Hill Requests, all inspections had been completed and the reports and the conditions stated therein were satisfactory and approved by Hill. Hill waived the right to make further inspections and/or to request remedies to deficiencies that would be indicated by an inspection. Notwithstanding these waivers, the Hill Requests contained references to deficiencies identified as "Items #1 - #21 of the Inspection Summary Report with photos attached" and noted the requested remedy

14

as follows: "The Inspection Summary Report outlines all requested Remedies."[17] According to the Hill Requests document and Bella's testimony, Bella declined to remedy any items. Bella testified that she did not review the Hill Inspection Report in connection with the Hill Requests.

Bella also testified that she had a conversation with her realtor regarding the Hill Requests and the Hill Inspection Report. Bella's realtor did not discuss in detail the report with her, but simply indicated that the report identified a lot of little things and noted that Hill wanted every item fixed. According to Bella, she "didn't ask her [realtor] to give [her] a detailed description of what they were, because … it was the first offer [she'd] gotten and [she] had lots of activity on the home[,] it's a great home[,] … [ and she] knew [she] would sell it[,]" which is why she decided not to deal with the inspection and declined to remedy any items.[18]

Not only was Bella's testimony uncontradicted, her testimony was supported by the testimony of her realtor. McBride testified that a copy of the Hill Inspection Report should have been submitted to Bella with the Hill Requests, but she and Bella "never went through the entire inspection together." Neither the testimony of Mary or Derbonne nor any of the evidence introduced at trial addressed Bella's actual knowledge of the contents of the Hill Inspection Report.

In the absence of a sound reason for its rejection or circumstances in the record casting suspicion on the reliability of Bella's testimony, the trial court should have accepted Bella's testimony as true.[19] See **Holiday**, 508 So.2d at 1383; **Johnson**, 454 So.2d at 1117; **Mergen**, 524 So.2d at 1352. While deference is given to the fact

---

[17] While the Hill Requests document was admitted into evidence, there are no attachments to the document.

[18] The Hill Requests indicate that Hill accepted Bella's refusal to make repairs on September 13, 2021, and elected to proceed to the act of sale. It is not clear from the record why the sale to Hill fell through.

[19] We note that nothing in the record provides any reason to reject Bella's testimony, nor does the record contain circumstances casting suspicion on the reliability of Bella's testimony.

finder when reasonable evaluations of credibility and reasonable inferences of fact are made in light of conflicts in testimony, no conflict existed here. See **Stobart**, 617 So. 2d at 882. Aside from Bella's testimony, no evidence or testimony was presented relating to Bella's actual knowledge of the contents of the Hill Inspection Report. Despite the Kniepers' arguments that mere possession of the Hill Inspection Report constituted full knowledge of the contents thereof, neither the law nor the facts support this assertion. A "[k]nown defect" is a "condition found within the property that was *actually known* by the seller ...." La. R.S. 9:3196(1). (Emphasis added.) Constructive knowledge is not sufficient.

Therefore, no reasonable basis exists in the record for the trial court's apparent factual finding that Bella violated La. R.S. 9:3198 or that she made willful misrepresentations in a property disclosure document such that she could be found liable for any error, inaccuracy, or omission of any information required to be delivered to the purchaser in a property disclosure document pursuant to La. R.S. 9:3198(E)(1) or liable for fraud.[20] Based on the law, testimony, and evidence presented in this case, we find that the trial court was manifestly erroneous to the extent it found otherwise. Accordingly, we find merit in Bella's first two assignments of error.

In Bella's third assignment of error, she maintains that the trial court erred in awarding liquidated damages to the Kniepers. Regarding liquidated damages, the

---

[20] Pursuant to La. Civ. Code art. 1953, fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." "Fraud may also result from silence or inaction." La. Civ. Code art. 1953. The party asserting a claim of fraud has the burden of proving fraud by a preponderance of the evidence, both direct and circumstantial. See La. Civ. Code art. 1957. **Markiewicz v. Sun Constr., L.L.C.**, 2021-1535 (La. App. 1st Cir. 6/14/22), 343 So.3d 758, 766. In order to recover for fraud, the plaintiff bears the burden of proving (1) a misrepresentation of material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury. **Id.** Fraudulent intent, or the intent to deceive, is a necessary and inherent element of fraud. Fraud cannot be predicated upon mistake or negligence, no matter how gross. **Minton v. Acosta**, 2021-1180 (La. App. 1st Cir. 6/3/22), 343 So.3d 721, 730. Moreover, a defendant cannot fraudulently conceal his mistake if he has no knowledge of that mistake. **Markiewicz**, 343 So.3d at 766.

16

Purchase Agreement provides if either the buyer or seller is in default of the Purchase Agreement, then the other party has the right to declare the agreement null and void with no further demand. Alternatively, the other party may demand and/or sue for termination of the Purchase Agreement, specific performance, or termination of the Purchase Agreement and liquidated damages in an amount equal to 10% of the sales price. The Purchase Agreement further provides that the buyer is entitled to the return of the deposit if the seller defaults and the seller is entitled to retain the deposit if the buyer defaults. Accordingly, in order for the Kniepers to be entitled to seek liquidated damages, Bella must have been in default under the terms of the Purchase Agreement.

In the reconventional demand, the Kniepers alleged that Bella provided them with a property disclosure document she knew contained false and inaccurate information and that the false statements in the Disclosure were willful misrepresentations, nullifying the Purchase Agreement. However, the Kniepers' allegations concerning the information provided or not provided in the Disclosure do not correspond with the rights and obligations in the Purchase Agreement and could not form the basis of a breach of the Purchase Agreement. See La. R.S. 9:3198(D)(1).

We note that in their original answer, the Kniepers identified damage to the garage door and stucco trim above the garage door on the Property, which damage the Kniepers allege apparently occurred after the parties entered into the Purchase Agreement. Mary and Derbonne testified that both the stucco and the garage door damage were not present when the Purchase Agreement was submitted. At trial, McBride testified that during the time the sale was pending with the Kniepers, there was damage to the stucco over the garage, which was repaired prior to the closing date.

Pursuant to the Inspection and Due Diligence Period provisions of the Purchase Agreement, the Kniepers acknowledged that the sale price of the Property was negotiated based upon the Property's apparent current condition and that Bella was not obligated to make repairs to the Property. However, Bella was responsible for maintaining the Property in substantially the same or better condition as it was when the Purchase Agreement was fully executed.

The Inspection and Due Diligence Period provisions provided remedies if the Kniepers were not satisfied with the condition of the Property or the results of their due diligence investigation: (1) the Kniepers could terminate the Purchase Agreement and declare it null and void or (2) the Kniepers could identify deficiencies and desired remedies and request that Bella remedy the deficiencies. Importantly, the Inspection and Due Diligence Period provisions clearly stated that failure to give written notice of either termination or deficiencies and desired remedies to the seller within the inspection and due diligence period "SHALL BE DEEMED AS ACCEPTANCE BY THE BUYER OF THE PROPERTY'S CURRENT CONDITION." However, the Kniepers allotted "0" calendar days for an inspection and due diligence period. In failing to allot a time period for inspection and due diligence, the Kniepers could not timely give written notice and, therefore, were deemed to accept the Property's current condition. Accordingly, Bella cannot be said to be in default of the Inspection and Due Diligence Period provisions of the Purchase Agreement.

The record does not otherwise support a finding Bella defaulted under the terms of the Purchase Agreement; therefore, the trial court erred in awarding liquidated damages to the Kniepers. Bella's third assignment of error has merit.

In her fifth and sixth assignments of error, Bella maintains that the trial court erred in failing to find that the Kniepers defaulted under the Purchase Agreement and in failing to award Bella remedies under the Purchase Agreement. According

18

to Bella, the Kniepers defaulted by arbitrarily refusing to close on the sale pursuant to the terms of the Purchase Agreement. The Kniepers maintained that they had cause to terminate the contract. However, as concluded above, the terms of the Purchase Agreement do not support the Kniepers' reasons for termination.

On November 4 and November 15, 2021, the Kniepers attempted to cancel the Purchase Agreement, but Bella did not accept either cancellation. According to Mary's testimony, she did not receive any response to the Second Cancellation, and did not have any communication with McBride about the Second Cancellation. However, Bella's attorney sent correspondence to Mary on November 22, 2021, via overnight FedEx delivery, informing her that Bella rejected both cancellations. The correspondence further demanded that Mary close on the sale on or before November 29, 2021, or a lawsuit would be filed.

On November 23, 2021, Taylor Schupp from the title company sent an e-mail to all parties confirming the closing date of November 29, 2021 at 2:00 p.m. However, on November 29, 2021 at 8:36 a.m., Schupp sent all parties an e-mail, stating: "This closing has been cancelled. Buyer will not be attending. I will go ahead and cancel this file." Schupp did not testify.

Mary testified that upon receipt of Schupp's November 29, 2021 e-mail, she understood that the closing was cancelled. Notwithstanding, Mary agreed that she was aware of the closing on November 29, 2021, and agreed that she refused to appear. Mary further testified that she refused to appear for the reasons stated in the cancellations – the failure to obtain financing and new damages – and acknowledged that she canceled the final walkthrough inspection.[21] Derbonne testified that the Kniepers did not want the house after they discovered the new damage on the garage.

---

[21] The Purchase Agreement provided that the Kniepers "shall have the right to re-inspect the Property within five (5) calendar days prior to the Act of Sale ... in order to determine if the Property is in the same or better condition as it was at the initial inspection(s) and to insure all agreed upon repairs have been completed."

In response, Derbonne told the Kniepers that she would find out who did the previous inspection and request a copy of the inspection report to see if there was anything noted in the inspection.

Based on the testimony and evidence, we are constrained to conclude that the Kniepers breached the Purchase Agreement, and that the trial court's ruling to the contrary constitutes an erroneous application of the contract between the parties. The Purchase Agreement clearly provided that the act of sale was to be executed before a settlement agent or notary public on November 29, 2021, which settlement agent or notary public was to be chosen by the Kniepers. In refusing to appear at the closing and in failing to execute the act of sale on November 29, 2021, the Kniepers were in default of the terms of the Purchase Agreement.[22]

As noted above, the Purchase Agreement provides for remedies for default, including declaring the Purchase Agreement null and void or suing for termination of the Purchase Agreement, liquidated damages in an amount equal to 10% of the sales price, and retention of the deposit. Because the Kniepers were in default, Bella is entitled under the terms of the Purchase Agreement to sue for termination of the Purchase Agreement, liquidated damages in an amount equal to 10% of the sales price, and retention of the $2,000.00 deposit in the event of the Kniepers' default. Accordingly, we find merit in Bella's fifth and sixth assignments of error.

In her fourth assignment of error, Bella maintains that the trial court erred in awarding attorney's fees to the Kniepers and further argues that she is entitled to attorney's fees under the Purchase Agreement. Under the Purchase Agreement, the prevailing party to any litigation brought to enforce any provision of this Agreement shall be awarded their attorney's fees and costs. In light of our finding that the Kniepers defaulted under the Purchase Agreement, Bella is the prevailing party and

---

[22] Bella and McBride appeared at the originally scheduled closing, despite the cancellation e-mail from Schupp, and testified that they were prepared to close.

is entitled to attorney's fees and costs.[23] We find merit to Bella's fourth assignment of error.

## CONCLUSION

For the above and foregoing reasons, we reverse the October 27, 2023 judgment of the trial court and render judgment in favor of plaintiff, Dessie Falcon Bella, and against defendants, Mary and Henry Knieper, in the amount of $47,500.00, plus the deposit in the amount of $2,000.00, legal interest from the date of demand, until paid, and for all court costs. The reconventional demand filed by Mary and Henry Knieper is hereby dismissed with prejudice, at their costs. Plaintiff, Dessie Falcon Bella, as the prevailing party, is awarded attorney's fees against Mary and Henry Knieper. This matter is remanded to the trial court for a determination of the award of attorney's fees. Mary and Henry Knieper are hereby taxed with the costs of this appeal.

**REVERSED, RENDERED, AND REMANDED.**

---

[23] The Purchase Agreement further provided that the buyer may also be liable for broker fees in the event of default of the buyer.